UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                             :
JACQUES STERLIN,                                             :
                                        Plaintiff,           :
                                                             :          11 Civ. 0715 (JPO)
                     -v-                                     :
                                                             :          OPINION AND ORDER
CITY OF NEW YORK;                                            :
NYC POLICE CAPTAIN MICHAEL CODY;                            :
LT. STEPHEN PHELAN, SHIELD #2474;                           :
P.O. WILLIS YOUNG, SHIELD #31374;                           :
P.O. CHARLES YARTON, SHIELD #26872;                         :
and                                                          :
SGT. ALKIVIADIS PANOPOULOS, in their                        :
individual and official capacities,                         :
                                        Defendants. :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

      Plaintiff Jacques Sterlin alleges that the individual Defendants falsely arrested him

because he was dressed in Muslim attire.  He brings claims under 42 U.S.C. § 1983 for false

arrest and excessive use of force, claims under 42 U.S.C. § 1985 for conspiracy to violate his

rights to equal protection and freedom of religion, and state law claims for false arrest, assault,

and battery.  Defendants move for dismissal of the excessive force, assault, and battery claims

for failure to state a claim, and summary judgment on all claims except the § 1985 claims.

Sterlin does not oppose summary judgment in favor of Cody, Phelan, Young, and Yarton on the

false arrest claims.  For the reasons that follow, Defendants' motion is granted in part and denied

in part.

I.      Background

      A.      Factual Background

      Unless otherwise noted, this section summarizes the evidence in the light most favorable

to Sterlin.

In the late afternoon of November 10, 2009, Sterlin took the M60 Bus to visit his aunt, who lived on 101st Street near Broadway in New York City.  (Leist Decl. Ex. H. (Sterlin Dep.) 24:16–25:11, Dkt. Nos. 34-8 & 34-9.)  He exited the bus at 106th Street and Broadway.  (*Id.* at 25:11–25:20.)  Sterlin was wearing distinctly Muslim clothing—a top he describes as a grey robe that goes past his knees—with an army jacket, a Vietnam Veteran hat, and a backpack.  (*Id.* at 25:25–26:11.)  He has a white beard, and in November 2009, he was sixty-three years old.  (Leist Decl. Ex. G (Sterlin 50-h Hrg.) 4:9, Dkt. Nos. 34-7 & 34-8; Hoffner Decl. Exs. 1–6 (Photographs of Sterlin), Dkt. Nos. 40-1–40-6.)  He walked into a liquor store on Broadway between 104th and 105th streets and bought a bottle of Hennessy, which he sipped once while he continued walking down Broadway, and then left on 104th Street toward Amsterdam Avenue.  (Sterlin Dep. 26:16–28:13.)  Sterlin was taking a detour to the Douglas Projects on 103rd Street and Amsterdam Avenue.  (*Id.* at 28:22–24, 29:25–30:11.)  One of Sterlin's friends had a card to send to a resident of the building, and the friend had asked Sterlin to check for the correct street address and apartment number the next time he was in the neighborhood.  (*Id.* at 28:16–24.)  Sterlin walked into the courtyard of the building, which was at 875 Amsterdam Avenue, and looked for the correct name written next to the buzzer at the front door.  (*Id.* at 30:9–32:22.)  He did not enter the building.  (*Id.* at 32:23–35.)  He left the courtyard and continued walking south on Amsterdam Avenue, then turned right on 102nd Street to walk back toward Broadway.  (*Id.* at 33:2–19.)

Before Sterlin reached Broadway, Defendants Lieutenant Stephen Phelan and Captain Michael Cody arrested him.  (*Id.* at 34:14–36:23; Leist Decl. Ex. C (Cody Dep.) 2:10–25:2, Dkt. Nos. 34-2 & 34-3.)  Cody testified that he and Phelan arrested Sterlin based on a radio transmission they had received from Defendant Sergeant Alkiviadis Panopoulos.  (Cody Dep. at

22:14–23:9.)  Cody testified that Panopoulos had stated that he observed a "male black" in "dark clothing" complete a possible drug transaction, and that the man was walking down 102nd Street.  (*Id.*)  Panopoulos testified that, through his spotting scope, he had observed an "older male," "either white or Hispanic," who was wheeling a grocery cart, exchange a small, white object for money on the west side of Amsterdam Avenue between 102nd and 103rd Streets. (Leist Decl. Ex. B (Panopoulos Dep.) 11:4–14:4, Dkt. No. 34-1.)  Panopoulos's testimony was that he radioed Cody and Phelan to describe the man, saying "look, this guy looks a little bit like Santa Claus, with a shopping cart.  You can't miss him."  (*Id.* at 15:24–16:6.)

Sterlin's recollection of the arrest is not perfectly clear, because the arrest took place so quickly, but he believes that one man grabbed his backpack from behind and pulled it off, then the other man quickly grabbed one or both of his shoulders and spun him around.  (Sterlin Dep. at 34:14–36:8.)  Phelan and Cody wordlessly showed Sterlin their badges and pushed him toward their double-parked SUV.  (*Id.* at 34:16, 35:14–15, 36:7–8, 37:18–19.)  Sterlin did not resist.  (*Id.* at 34–36.)  They faced him against the SUV, handcuffed him, and told him to get into the backseat; Sterlin could not comply because of a medical issue with his legs, so they lifted him up and "thr[e]w" him sideways into the the car.  (Sterlin Dep. at 36:20–37:11.)

Phelan and Cody drove Sterlin two or three minutes to 101st Street and West End Avenue, where they got out of the SUV and talked to two other officers, Defendant Police Officers Willis Young and Charles Yarton.  (*Id.* at 39:11–21; Leist Decl. Ex. E (Young Dep.) 7:13–16, 15:15–25, 16:2–14, Dkt. Nos. 34-4 & 34-5; Leist Decl. Ex. F. (Yarton Dep.) 8:21–24, Dkt. Nos. 34-5–34-7.)  Phelan and Cody handed Sterlin's backpack to Young and Yarton and left Sterlin in their custody.  (Sterlin Dep. 39:24–40:7.)  Young and Yarton gave Sterlin a pat-down and then helped him through the side door of a van.  (*Id.* at 40:6–41:1.)  One officer sat in the driver's seat of the van while the other stood at the front passenger door and searched Sterlin's

backpack.  (*Id.* at 41:8–43:19.)  After the search was over, Sterlin told the officers that he could not feel his hands because his handcuffs were too tight.  (*Id.* at 43:20–43:23.)  Both of his hands were swollen.  (*Id.* at 53:24–25.)  The officer who searched Sterlin's backpack told him to be patient.  (*Id.* at 43:24–25.)  They left Sterlin handcuffed in the van for over an hour.  (*Id.* at 45:15–17.)

Phelan and Cody eventually returned to the van with another woman whom they had arrested.  (*Id.* at 44:8–13.)  Young or Yarton told Sterlin to move to the back row of the van to make room for the woman.  (*Id.* at 44:13–18.)  When Sterlin stood, he felt dizzy and he had chest pain.  (*Id.* at 44:18–21.)  He fell onto the floor when he tried to sit in the back seat, and he was unable to catch his breath.  (*Id.* at 44:21–25.)  The woman who had just been arrested told the officers to help Sterlin—she said she was afraid that he would die.  (*Id.* at 44:21–24, 46:15–16.)  One of the officers took Sterlin's pulse and said "it's too low, too low, we got to take him," but the voice sounded far away.  (*Id.* at 46:2–6, 15–19.)  Sterlin passed out.  (*Id.* at 46:13–17.)  His next memory is of other voices, still sounding far away, talking about removing Sterlin's handcuffs and getting him out of the van and onto a stretcher.  (*Id.* at 46:5–47:10.)  He was at the St. Luke's Hospital emergency room.  (*Id.* at 46:19–20.)

Sterlin was carried into the emergency room on a stretcher.  (*Id.* at 47:3–10.)  The doctors treated him for high blood pressure.  (*Id.* at 47:18–19.)  One of the officers stayed with Sterlin for about an hour while they waited for news from the doctor.  (*Id.* at 47:21–49:20.)  The officer apologized and told Sterlin he was no longer under arrest; rather, the officer would issue a trespassing summons so that Sterlin would not have to appear on more serious charges.  (*Id.* at 48:4–16.)

St. Luke's discharged Sterlin the next day because he wanted to be treated at the VA hospital.  (*Id.* at 49:22–25.)  A close family friend brought Sterlin to his aunt's house.  (*Id.* at

4

50:1–51:2.)  Sterlin told his aunt and his friend what had happened the day before, and they

photographed his injuries.  (*Id.* at 51:2–5.)  The photographs show a bruise on Sterlin's left arm

near his elbow, a group of bruises in the shape of fingers wrapped around his upper right arm,

and visible swelling in both wrists.  (Photographs of Sterlin.)  Sterlin refused to go home because

he felt traumatized and he was not feeling well; instead, he stayed at his aunt's house for a few

days.  (Sterlin Dep. 51:7–13.)  He felt weak on his left side, and he could not stand up to walk.

(*Id.*)  His aunt and his friend eventually took him to the VA hospital, where doctors told him that

he had suffered a stroke.  (*Id.* at 51:12–25).

## II.    Summary Judgment Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A fact is material

if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986), and a dispute is genuine if, considering the record as a whole, a

rational jury could find in favor of the non-moving party, *Ricci v. DeStefano*, 557 U.S. 557, 586

(2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

On a motion for summary judgment, the party bearing the burden of proof at trial must

come forward with evidence on each element of its claim or defense illustrating its entitlement to

relief.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  It cannot rely upon mere

"conclusory statements, conjecture, or speculation" to meet its burden.  *Kulak v. City of New*

*York*, 88 F.3d 63, 71 (2d Cir. 1996) (citations omitted).  If the party with the burden of proof

makes the requisite initial showing, the burden shifts to the opposing party to identify specific

evidence creating a genuine issue for trial, *i.e.*, evidence creating a factual issue about which

reasonable minds could disagree.  Fed. R. Civ. P. 56(f); *Anderson*, 447 U.S. at 250–51.  The

court should view all evidence "in the light most favorable to the nonmoving party and draw all

reasonable inferences in its favor," and a motion for summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citations and quotations omitted). "Issues that depend on the credibility of witnesses . . . are to be decided by the jury." *Gunning v. Cooley*, 281 U.S. 90, 94 (1930).

## III.    Discussion

### A.    Section 1983 and State Law False Arrest Claims

To succeed on a claim under § 1983, a plaintiff must demonstrate that a state actor violated his federally protected rights. *West v. Atkins*, 487 U.S. 42, 48 (1988). A false arrest violates the Fourth Amendment right to be free from unreasonable seizure of one's person. *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) (Sotomayor, J.). The elements of a false arrest claim under § 1983 depend on the law of the state in which the arrest occurred. *Id.* at 151–52 (citing *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)); *see also Davis*, 364 F.3d at 433 n.7 (explaining rationale for applying state tort law to constitutional claims under § 1983). In this case, the parties do not dispute that the plaintiff was arrested; the only question is whether the arrest was justified. Under New York law, probable cause to arrest the plaintiff is an absolute defense to a false arrest claim against a police officer. *Jaegly*, 439 F.3d at 152. Probable cause to arrest is "knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) (citing, *inter alia*, *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979) (collecting definitions of probable cause)). The facts known to the arresting officer are assessed against an objective "person of reasonable caution" standard: the arresting officer's subjective intent is irrelevant. *Id.* (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)).

Even if a plaintiff can demonstrate that a police officer arrested him without probable cause, the officer is not liable if it was objectively reasonable for the officer to believe that he did have probable cause. *Id.* This qualified immunity standard is known as "arguable probable cause," and it protects officers from personal liability where, although the officer made the wrong call, he was making a close call and he acted reasonably under the circumstances. *See id.* at 369–70; *see also Tolan v. Cotton*, __ U.S. __, 2014 WL 1757856, *4 (May 5, 2014) (per curiam) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)) ("The salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." (alterations adopted)). The objective reasonableness of an officer's conduct is a mixed question of law and fact—if there is disagreement about what the officer knew or did, that question must be resolved by the jury. *Zellner*, 494 F.3d at 371 (quoting *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)).

There is disagreement in this case over what Sergeant Panopoulos knew when he directed Captain Cody and Lieutenant Phelan to arrest Sterlin. Panopoulos claims that he saw Sterlin exchange a small object for cash on Amsterdam Avenue between 102nd and 103rd Streets. Sterlin claims that Panopoulos did not see anything of the sort; rather, in the vicinity of the block where Panopoulos claimed to be watching, Sterlin merely walked down the street. A jury would be entitled to credit Sterlin's testimony over Panopoulos's. If they did, Panopoulos would be liable for false arrest, and he would not be entitled to qualified immunity. The Court would hold that Panopoulos lacked arguable probable cause to arrest Sterlin. No reasonable officer could conclude that Sterlin's conduct, as Sterlin described it, constituted probable cause for arrest. Therefore, what Panopoulos observed Sterlin do on Amsterdam Avenue between 102nd and 103rd Streets is a genuinely disputed material fact underlying Sterlin's false arrest claim. The Court denies summary judgment on the federal and state false arrest claims against Panopoulos.

Sterlin does not oppose summary judgment on the federal and state false arrest claims against Cody, Phelan, Young, and Yarton; therefore, the Court grants summary judgment on those claims in their favor.

### B.   Section 1983 and State Law Excessive Force Claims[1]

The Fourth Amendment also protects the right to be free from an officer's use of unreasonable (excessive) force during the course of an arrest. *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Like the test for probable cause, the Fourth Amendment reasonableness test is an objective one. *Id.* (quoting *Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005)). The Court disregards the arresting officer's subjective intent and instead considers "whether, in light of the totality of the circumstances faced by the arresting officer, the amount of force used was objectively reasonable at the time." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) (citing *Graham*, 490 U.S. at 397). The objective reasonableness of any use of force depends on the balance between governmental interests justifying the force and the individual's interest in his liberty and bodily integrity. *See Tolan*, 2014 WL 1757856 at *4 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). Courts must consider, at a minimum, the nature and severity of the crime leading to the arrest, whether the suspect posed an immediate threat to the safety of another person, and whether the suspect was resisting arrest or attempting to flee. *Tracy*, 623 F.3d at 96.

---

[1] Defendants' motion on this point is styled as a motion to dismiss and a motion for summary judgment. It is too late for Defendants to file a motion under Rule 12(b) of the Federal Rules of Civil Procedure, which specifies that a motion to dismiss for failure to state a claim must be asserted before filing an answer. The Court therefore interprets Defendants' motion to dismiss as a motion for judgment on the pleadings under Rule 12(c), but it makes no difference—both types of motions must be converted into Rule 56 motions if the Court considers matters outside the pleadings. Fed. R. Civ. P. 12(d). Conversion is proper so long as both parties have adequate notice. *Hernandez v. Coffey*, 582 F.3d 303, 307 (2d Cir. 2009). In this case, Sterlin failed to acknowledge Defendants' motion to dismiss, treating the entire motion as a motion for summary judgment. He will not be caught off guard by conversion.

Because police officers often decide how much force to use in "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—" courts must evaluate the record "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006)).  The same standard applies to assault and battery claims against a police officer under New York law.  *Humphrey v. Landers*, 344 Fed. App'x 686, 688 (2009) (quoting *Posr v. Doherty*, 944 F.2d 91, 94–95 (2d Cir. 1991)) ("Except for § 1983's requirement that the tort be committed under color of state law, the essential elements of excessive force and state law assault and battery claims are substantially identical.").

As is the case with a false arrest claim, even if a police officer's use of force is objectively unreasonable, he is entitled to qualified immunity if the law did not give him "fair warning" that his conduct was unconstitutional.  *Tolan*, 2014 WL 1757856 at *4 (quoting *Hope*, 536 U.S. at 741).  Courts must define "clearly established" rights (rights of which officers have fair warning) on the basis of the specific context of a use of force, not as general rules governing when an officer may strike a blow.  *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  The question is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) (quoting *Saucier*, 533 U.S. at 201).  But when deciding a summary judgment motion, "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan*, 2014 WL 1757856 at *4 (per curiam) (citing *Brosseau*, 542 U.S. at 195, 198) (vacating judgment that made this error).

A reasonable jury could find that Sterlin did not resist arrest in any way, and that, in the absence of such resistance, Captain Cody and Lieutenant Phelan used excessive force by handcuffing Sterlin and then throwing him into the back of their SUV.  This conclusion is

supported by Sterlin's testimony and photographs showing bruising on his upper arms.  Even if Cody and Phelan believed that Panopoulos witnessed Sterlin make a hand-to-hand drug sale, this crime is not violent, and it is not otherwise serious enough to merit throwing a sixty-three-year-old man into an SUV, while he was handcuffed, because his limited mobility kept him from climbing into the SUV himself.  Sterlin posed no threat to the officers—again, he was handcuffed, and there was no indication that he would try to hurt them.  Nor was there any indication that he would attempt to flee.  Sterlin complied with all of the officers' directions.  Under these circumstances, if Cody and Phelan truly threw Sterlin into the back of their SUV while he was handcuffed, they would not be entitled to qualified immunity.  No reasonable officer could believe that this was a reasonable use of force under the circumstances.  The officers were on fair notice that, when an older man with limited mobility makes a small-time drug sale, and there is no indication that he intends to become violent or flee, it is unreasonable to pick him up and throw him into a car while he is handcuffed in a manner that causes bruising.  The factual dispute over whether the officers threw Sterlin into the SUV, and whether he was acting in a manner that justified that use of force, is therefore a dispute that is material to the excessive force claims against Cody and Phelan.

A reasonable jury could also find that Officers Young and Yarton refused to loosen Sterlin's handcuffs, even though they both heard his complaint that the handcuffs were hurting him and interfering with his circulation.  The jury could also find that the handcuffs were so tight that they caused substantial swelling in Sterlin's wrists lasting at least a day after they were removed.  In the context of this arrest, such factual findings could sustain Young and Yarton's liability for excessive force.  In addition to the reasonableness of the initial decision to handcuff the plaintiff, district courts in this Circuit have borrowed three considerations that the other circuits emphasize in tight handcuff cases: evidence that "1) the handcuffs were unreasonably

tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists [was beyond temporary discomfort]." *Esmont v. City of New York*, 371 F. Supp. 2d 202, 215 (E.D.N.Y. 2005) (citations omitted). All three considerations weigh in Sterlin's favor: the handcuffs were so tight that they caused pain and numbness, Young and Yarton ignored his complaints about the handcuffs, and after the handcuffs were removed, his wrists remained visibly swollen into the next day. While the Second Circuit does not appear to have explicitly endorsed these factors, it has recognized excessive force claims based on excessively tight handcuffs. *See Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) (vacating grant of qualified immunity where officer cuffed plaintiff too tightly in front of his body and mocked plaintiff when plaintiff complained); *Calamia v. City of New York*, 879 F.2d 1025, 1028 (2d Cir. 1989) (upholding officers' liability for excessive force where plaintiff was tightly handcuffed for five to six hours). And it is a longstanding rule that a police officer cannot use force for no reason. The use of force must be justified by a legitimate government interest in order to qualify as reasonable. *Tolan*, 2014 WL 1757856 at *4 (citing *Graham*, 490 U.S. at 396; *Garner*, 471 U.S. at 8). A reasonable officer would have been on notice that, in this context, it was unreasonable to leave Sterlin in overly tight handcuffs for more than an hour. As noted above, Sterlin was arrested for a hand-to-hand drug transaction. He did not resist arrest or do anything else to suggest that he posed a risk of violence or flight; in fact, he was an older man with limited mobility. Young and Yarton concede that their assignment for the day was to monitor the prisoner van. (Young Dep. at 7:13–16; Yarton Dep. at 8:21–24.) They had no responsibility other than tending to the prisoners, and during the hour that Sterlin was handcuffed in the van, he was the only prisoner for Young and Yarton to monitor. In short, there was no government interest that would have led a reasonable officer to conclude that it was lawful to leave Sterlin in painfully tight handcuffs for an hour. *Accord Usavage v. Port Auth.*, 932 F.

11

Supp. 2d 575, 598 (S.D.N.Y. 2013) (quoting *Matthews v. City of New York*, 889 F. Supp. 2d 418, 443–44 (S.D.N.Y. 2012) ("Given that plaintiffs allegedly did not resist arrest, the use of excessively tight handcuffs by the police officers could have been unwarranted.") (alterations adopted); *Golio v. City of White Plains*, 459 F. Supp. 2d 259, 265 (S.D.N.Y. 2006) ("Any reasonably competent police officer would know that he should not cuff a prisoner so tightly as to cause injury—especially injury that is immediately apparent, because it is visible to the naked eye.")).  If the jury credited Sterlin's version of events, as it would be entitled to do, Yarton and Young would not be entitled to qualified immunity.  There is therefore a genuine issue of material fact regarding Yarton and Young's liability for excessive force.  Summary judgment on this claim is denied.

## IV.    Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment with respect to Sterlin's false arrest claims against Defendants Cody, Phelan, Young, and Yarton under federal and state law.  In all other respects, Defendants' motion is denied.

The Clerk of Court is directed to terminate the motion at docket number 32.

The parties shall submit their pretrial filings, as prescribed by this Court's individual practices, within 30 days.  The parties are also directed to confer regarding (1) whether they consent to trial before Magistrate Judge Francis, (2) anticipated length of trial, and (3) potential trial dates, and to submit a joint letter addressing those issues on or before July 7, 2014.

SO ORDERED.

Dated:   New York, New York
        June 5, 2014

_____
J. PAUL OETKEN
United States District Judge

12